**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-55 (EGS)** |
| **v.** | : | |
| | : | |
| **DOMINICK MADDEN,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM[1]

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth here, the government requests that this Court sentence Dominick Madden to 60 days of imprisonment, followed by 36 months of probation, and $500 restitution.

### I.    Introduction

Dominick Madden, a sanitation worker from New York, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred law enforcement officers, and

---

[1] The government submits this memorandum in accordance with the deadline proposed by the parties in their joint motion to continue sentencing memorandum dates. ECF 29. The government agrees that the defendant should be given an opportunity to respond to the government's sentencing memorandum, particularly in light of newly discovered evidence. On February 23, 2022, the government discovered new video evidence of the defendant. The government immediately notified defense counsel, sent defense counsel copies of the videos within 24 hours of their discovery, and proposed a continuance of sentencing to allow both parties to review the evidence. Defense counsel expressed a preference that sentencing go forward as scheduled. In light of this information, the government agrees to any amount of time defense counsel needs to respond to the government's memorandum.

resulted in more than one million dollars' of property damage. The Court should consider that the defendant's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm law enforcement, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed.

Madden pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in the Capitol Building. As explained here, a sentence of 60 days of imprisonment, followed by 36 months of probation, and $500 restitution, is appropriate in this case because: (1) Madden was one of the first to breach the police line at the Lower West Terrace, encouraging others to go forward in the process, (2) Madden witnessed multiple assaults on law enforcement officers when he breached that line and chose to go forward, (3) Madden attempted to destroy evidence upon returning home from the Capitol, and (4) Madden did not express any contrition or remorse until filing his sentencing memorandum.

## II.   Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

A general summary of the facts surrounding the attack on the U.S. Capitol can be found in the Statement of Offense. *See* ECF 23 (Statement of Offense), at ¶¶ 1-7. As the Court knows, a riot cannot occur without rioters, and each rioter's actions—from the most mundane to the most violent—contributed, directly and indirectly, to the violence and destruction of that day. With that backdrop we turn to the defendant's conduct and behavior on January 6.

*Dominick Madden's Role in the January 6, 2021 Attack on the Capitol*

On January 5, Dominick Madden called out sick from his job as a sanitation worker in New York City and drove to Washington D.C. The next day, he joined the crowd of people who stormed the Capitol. Outside on the Capitol grounds, Madden aggressively shouted and waved a flag amongst the crowd, which was captured on video.[2] In the video, Madden wore a blue QAnon sweatshirt. He yelled "This is our country!" and "Where we go one, we go all!"—the slogan of the QAnon movement, a conspiracy theory centered on claims that Donald Trump is secretly fighting a group of elite pedophiles who operate a global child sex-trafficking operation, among other claims. The following is a screen shot from the video:

---

[2] A video of Madden shouting on the Capitol grounds can be viewed on the New York Post's website: https://nypost.com/2021/01/21/feds-charge-nyc-sanitation-worker-in-capitol-riot-after-post-story/.



Madden made his way through the crowd to the plaza just beyond the Lower West

Terrace, where the Capitol police were attempted to hold their line despite the huge crowd



As others around him shoved Capitol police officers, Madden made his way through the police line. Publicly-available video from Parler, **Government Exhibits B and C (Parler Videos 1 and 2)**, shows him breaching the line. The following are screenshots from the videos:





After breaching the line, Madden stood on his own and continued to wave his flag for the crowd, undoubtedly encouraging other rioters to follow, which was captured on CCTV footage (**Exhibit A**):



Within a minute, the entire plaza was overrun with rioters, completely overwhelming law enforcement. See **Government Exhibit D**, **Parler Video 3**. Madden continued to stand and wave his flag as the scene before him descended into chaos, with rioters shoving, pushing, and punching officers all around him:



Madden then climbed over a barrier and proceeded onward toward the Capitol building:



Madden eventually made his way into the Capitol and entered through the Senate Wing Door around 2:59 P.M—approximately 45 minutes after the door was first breached. By that time, both windows surrounding the door had been broken through, which Madden would have seen upon entering. He also would have heard an alarm blaring.



From there, Madden walked through the Crypt, still carrying his flag:



Madden returned to the Senate Wing Doors and left the Capitol around 3:12 p.m.. He was inside for approximately 12 minutes.

On January 14, the New York Post published an article entitled "Feds investigating NYC Sanitation Worker Caught on Video at Capitol Hill Riot." In it, the Post named Madden and included a photo of him at the Capitol. Six days later, FBI surveillance units saw Dominick Madden throw away a bag of trash. The FBI seized the trash bag and found the clothes Madden was wearing at the Capitol, including:

- The blue QAnon sweatshirt;

- A Trump flag;

- A black Under Armor baseball cap;

- A black pair of sweatpants.

*Madden's Arrest*

Madden was arrested on January 21, 2021. He declined an interview with the FBI. The agents seized his cell phone and learned that it had just been activated on January 16, 2021—two

days after the New York Post article was published. The agents did not recover the phone he had with him on January 6. Because of that, they were unable to recover any text messages, videos, or photographs relating to his crimes on Madden's phone.

*The Charges and Plea Agreement*

On January 21, 2021, Madden was charged by complaint with violating 18 U.S.C. §§ 1752(a)(1), (a)(2) and 40 U.S.C. § 5104(e)(2)(D) and (G). On January 27, 2021, he was charged by four-count Information with those same violations. On October 5, 2021, he pleaded guilty to Count Four of the Information, charging him with a violation of 40 U.S.C. § 5104(e)(2)(G), Parading, Demonstrating, or Picketing in the Capitol Building. In his plea agreement, Madden agreed to pay $500 in restitution to the Department of the Treasury.

### III.    Statutory Penalties

The defendant now faces a sentencing on a single count of 40 U.S.C. § 5104(e)(2)(G). As noted by the plea agreement and the U.S. Probation Office, the defendant faces up to six months of imprisonment and a fine of up to $5,000. The defendant must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply. 18 U.S.C. § 3559; U.S.S.G. §1B1.9. Because Madden has pled guilty to a petty offense, a term of supervised release is not authorized. *See* 18 U.S.C. § 3583(b)(3).

### IV.    Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. Some of those factors include: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote

respect for the law, § 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. § 3553(a)(6). Based on the combination of mitigating and aggravating factors in this case, the Section 3553(a) factors weigh in favor of a sentence of 60 days of imprisonment, followed by 36 months of probation, and $500 restitution.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was the one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

While each defendant should be sentenced based on their individual conduct, as we now discuss, this Court should note that each person who entered the Capitol on January 6 without authorization did so under the most extreme of circumstances. And each one contributed to the outcome. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 25 ("A mob isn't a mob without the numbers. The people who were committing those violent acts did so because they had the safety of numbers.") (statement of Judge Chutkan). As they entered the Capitol, they would—at a minimum—have crossed through numerous barriers and barricades and heard the throes of a mob. Depending on the timing and location of their approach, they also may have observed extensive fighting with law enforcement officials and smelled chemical irritants in the air. No rioter was a mere tourist that day.

Additionally, while looking at the defendant's individual conduct, we must assess such conduct on a spectrum. This Court, in determining a fair and just sentence on this spectrum,

should look to a number of critical factors, to include: (1) whether, when, how the defendant entered the Capitol building; (2) whether the defendant encouraged violence; (3) whether the defendant encouraged property destruction; (4) the defendant's reaction to acts of violence or destruction; (5) whether during or after the riot, the defendant destroyed evidence; (6) the length of the defendant's time inside of the building, and exactly where the defendant traveled; (7) the defendant's statements in person or on social media; (8) whether the defendant cooperated with, or ignored commands from law enforcement officials; and (9) whether the defendant demonstrated sincere remorse or contrition. While these factors are not exhaustive nor dispositive, they help to place each defendant on a spectrum as to their fair and just punishment.

To be clear, had the defendant personally engaged in violence or destruction, he would be facing additional charges and/or penalties associated with that conduct. The absence of violent or destructive acts on the part of the defendant is therefore not a mitigating factor in misdemeanor cases, nor does it meaningfully distinguish the defendant from most other misdemeanor defendants. The defendant's lack of violence and property destruction explains why he was charged only with, and permitted to plead to, a misdemeanor rather than felony.

Madden was only inside the Capitol for a short time, but his actions both before and after his time inside the Capitol warrant a custodial sentence. First, Madden was a key player in one of the most significant police line breaches—the line initially protecting the Lower West Terrace. Madden broke through first and waved his flag, which encouraged other rioters to follow. By pushing past officers, he also diverted the officers' attention—they then had to protect the space behind them and in front of them. Madden's actions made it easier for others to follow. Once that line was breached, law enforcement was overwhelmed and overrun as the massive crowd inched closer and closer toward the Capitol. The before and after pictures above are striking and show

how quickly the crowd became out of control.

Second, Madden's reaction to witnessing violence that day was to continue on. He stood by as the people around him punched, shoved, and pushed past law enforcement officers. He didn't turn around and go home. He knew exactly what was going on that day and chose to enter the Capitol anyway.

Third, Madden knew the FBI was investigating him after the New York Post article, and in response gathered all of his clothes from January 6 and tried to throw them out. He also replaced his phone on January 16. Because he presumably got rid of the one he used at the Capitol, the government does not have access to text messages or other means of communication that would have given us a window into his purpose for being at the Capitol, or other valuable evidence like pictures and videos.

Finally, Madden did not express remorse at the time of his arrest, nor did he do so in his PSR interview. Accordingly, the nature and the circumstances of this offense weigh in favor of a sentence of 60 days of imprisonment, followed by 36 months of probation, and $500 restitution.

### B.  The History and Characteristics of the Defendant

Madden only has one prior criminal conviction—for drunk driving in 2006. PSR ¶ 26. He comes from a "warm and loving" family and is a lifelong resident of New York. *Id.* ¶¶ 35–37. For the 21 years prior to his arrest, Madden worked as a sanitation worker for the New York Department of Sanitation. *Id.* ¶ 52. He resigned from that job because of his conduct in this case. *Id.*

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law.

"The violence and destruction of property at the U.S. Capitol on January 6 showed a blatant and

appalling disregard for our institutions of government and the orderly administration of the democratic process."[3] As with the nature and circumstances of the offense, this factor supports a sentence of probation with a period of home confinement and community service, which is of course not appropriate in every case arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually -- should be expected") (statement of Judge Hogan).

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The violence at the Capitol on January 6 was cultivated to interfere, and did interfere, with one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. As noted by Judge Moss during sentencing, in *United States v. Paul Hodgkins*, 21-cr-188-RDM:

> [D]emocracy requires the cooperation of the governed. When a mob is prepared to attack the Capitol to prevent our elected officials from both parties from performing their constitutional and statutory duty, democracy is in trouble. The damage that [the defendant] and others caused that day goes way beyond the several-hour delay in the certification. It is a damage that will persist in this country for decades.

---

[3] Federal Bureau of Investigation Director Christopher Wray, Statement before the House Oversight     and     Reform     Committee     (June     15,     2021),     available     at https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Wray%20 Testimony.pdf

Tr. at 69-70. Indeed, the attack on the Capitol means "that it will be harder today than it was seven months ago for the United States and our diplomats to convince other nations to pursue democracy. It means that it will be harder for all of us to convince our children and our grandchildren that democracy stands as the immutable foundation of this nation." *Id.* at 70; *see United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37 ("As other judges on this court have recognized, democracy requires the cooperation of the citizenry. Protesting in the Capitol, in a manner that delays the certification of the election, throws our entire system of government into disarray, and it undermines the stability of our society. Future would-be rioters must be deterred.") (statement of Judge Nichols at sentencing).

The gravity of these offenses demands deterrence. This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Madden did not express remorse for his conduct at the Capitol prior to the submission of his sentencing memo. Based on the PSR, his only regret seems to be that he lost his job because of it. It is important to impose a sentence that will deter him from future crimes—a sentence of incarceration and probation will do so.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as

in this case, to assault on law enforcement officers, to conspiracy to corruptly interfere with Congress.[4] Each offender must be sentenced based on their individual circumstances, but with the backdrop of the January 6 riot in mind. Moreover, each offender's case will exist on a spectrum that ranges from conduct meriting a probationary sentence to crimes necessitating years of imprisonment. The misdemeanor defendants will generally fall on the lower end of that spectrum, but misdemeanor breaches of the Capitol on January 6, 2021 were not minor crimes. A probationary sentence should not necessarily become the default.[5] Indeed, the government invites the Court to join Judge Lamberth's admonition that "I don't want to create the impression that probation is the automatic outcome here because it's not going to be." *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164 (RCL), Tr. 6/23/2021 at 19; *see also United States v. Valerie Ehrke*, 1:21-cr-00097 (PFF), Tr. 9/17/2021 at 13 ("Judge Lamberth said something to the effect . . . 'I don't want to create the impression that probation is the automatic outcome here, because it's not going to be.' And I agree with that. Judge Hogan said something similar.") (statement of Judge Friedman).

---

[4] Attached to this sentencing memorandum is a table providing additional information about the sentences imposed on other Capitol breach defendants. That table also shows that the requested sentence here would not result in unwarranted sentencing disparities.

[5] Early in this investigation, the Government made a very limited number of plea offers in misdemeanor cases that included an agreement to recommend probation in *United States v. Anna Morgan-Lloyd*, 1:21-cr-00164(RCL); *United States v. Valerie Elaine Ehrke*, 1:21-cr-00097(PFF); *United States v. Donna Sue Bissey*, 1:21-cr-00165(TSC), *United States v. Douglas K. Wangler*, 1:21-cr-00365(DLF), and *United States v. Bruce J. Harrison*, 1:21-cr-00365(DLF). The government is abiding by its agreements in those cases, but has made no such agreement in this case. *Cf. United States v. Rosales-Gonzales*, 801 F.3d 1177, 1183 (9th Cir. 2015) (no unwarranted sentencing disparities under 18 U.S.C. § 3553(a)(6) between defendants who plead guilty under a "fast-track" program and those who do not given the "benefits gained by the government when defendants plead guilty early in criminal proceedings") (citation omitted).

The defendant has pleaded guilty to Count Four of the Information, charging him with Parading, Demonstrating, or Picketing in the Capitol Building a violation of 40 U.S.C. § 5104(e)(2)(G). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(6), do apply, however.

For one thing, although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences—such as how a defendant entered the Capitol, how long he remained inside, the nature of any statements he made (on social media or otherwise), whether he destroyed evidence of his participation in the breach, etc.—help explain the differing recommendations and sentences.  And as that discussion illustrates, avoiding unwarranted disparities requires the courts to consider not only a defendant's "records" and "conduct" but other relevant sentencing criteria, such as a defendant's expression of remorse or cooperation with law enforcement.  *See United States v. Hemphill*, 514 F.3d 1350, 1365 (D.C. Cir. 2008) (no unwarranted disparity regarding lower sentence of codefendant who, unlike defendant, pleaded guilty and cooperated with the government).

In considering disparity, a judge cannot "consider all of the sentences not yet imposed." *United States v. Godines*, 433 F.3d 68, 69–71 (D.C. Cir. 2006). "The most a judge can do is consider those other sentences that do exist," and "[t]he comparable sentences will be much smaller in the early days of any sentencing regime than in the later." *Id*.; *see generally United States v. Accardi*, 669 F.3d 340, 346 (D.C. Cir. 2012) ("Without more, two allegedly similar

17

cases constitute too small a sample size to support a finding of an 'unwarranted disparity' in sentences."). In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id*. ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). Because the Sentencing Guidelines do not apply here, the sentencing court cannot readily conduct a disparity analysis against a nationwide sample of cases captured by the Sentencing Guidelines.

Even in Guidelines cases, sentencing courts are permitted to consider sentences imposed on co-defendants in assessing disparity. *E.g., United States v. Knight*, 824 F.3d 1105, 1111 (D.C. Cir. 2016); *United States v. Mejia*, 597 F.3d 1329, 1343-44 (D.C. Cir. 2010); *United States v. Bras*, 483 F.3d 103, 114 (D.C. Cir. 2007). The Capitol breach was *sui generis*: a mass crime with significant distinguishing features, including the historic assault on the seat of legislative branch of federal government, the vast size of the mob, the goal of impeding if not preventing the peaceful transfer of Presidential power, the use of violence by a substantial number of rioters against law enforcement officials, and large number of victims. Thus, even though many of the defendants were not charged as conspirators or as codefendants, the sentences handed down for Capitol breach offenses is an appropriate group for purposes of measuring disparity of any future sentence.

As the number of sentences in the Capitol breach misdemeanor cases increase and the pool of comparators grows, the effect on sentences of obviously aggravating considerations should become more apparent. The same is true for obviously mitigating factors, such as a defendant's efforts to prevent assaults on police.

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, it may be helpful for the Court to consider other cases where defendants witnessed violence outside of the Capitol building prior to entering. Examples include:

- In *United States v. Camper*, 21-cr-325 (CKK), Camper entered the Capitol despite seeing violence between rioters and officers, like Madden. Camper also concealed evidence after January 6. The government recommended two months' incarceration. Judge Kollar-Kotelly sentenced Camper to 90 days' incarceration.

- In *United States v. Smith*, 21-cr-290 (RBW), Smith witnessed violence unfolding outside the Capitol and led the removal of barricades from inside the Rotunda doors—allowing the mob to enter the Capitol. The government recommended five months' incarceration, and Judge Walton sentenced Castro to 90 days' incarceration.

It may also be helpful for the Court to consider other cases where defendants attempted to or did destroy evidence after January 6 and/or entered the Capitol for only a brief period of time. Some examples include:

- In *United States v. Mazzocco*, 21-cr-54 (TSC), Mazzocco deleted Facebook posts showing him at the Capitol, and then deleted his entire account altogether. Like Madden, Mazzocoo was only inside the Capitol for 12 minutes. The government recommended a sentence of three years of probation including three months of home confinement and 60 hours of community service. Judge Chutkan sentenced the defendant to 45 days in jail.

- In *United States v. Gruppo*, 21-cr- (BAH), Gruppo deleted all evidence from his phone, including photographs and videos he had taken inside the Capitol Building. He spent six minutes inside the Capitol Building. The government recommended 30 days of jail. Judge Howell sentenced Gruppo to two years of probation, including 90 days of home detention.

- In *United States v. Kostolsky*, 21-cr-197 (DLF), Kostolsky deleted videos from his phone. He was inside the Capitol for less than a minute. The government recommended a sentence of one month of incarceration. Judge Friedrich sentenced him to three years of probation and one month of home detention.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

### V.     The Court's Lawful Authority to Impose a Split Sentence

The sentence requested by the government—60 days of imprisonment, followed by 36 months of probation, and $500 restitution—is a lawful one. A sentencing court may impose a "split sentence"—"a period of incarceration followed by period of probation," *Foster v. Wainwright*, 820 F. Supp. 2d 36, 37 n.2 (D.D.C. 2011) (citation omitted)—for a defendant convicted of a federal petty offense, such as the crime at issue in this case. *See* 18 U.S.C. § 3561(a)(3). In addition, for a defendant convicted of any federal offense, a sentencing court may impose incarceration for a brief interval as a condition of probation under 18 U.S.C. § 3563(b)(10).

### a.    *A sentence imposed for a petty offense may include both incarceration and probation.*

#### i.   Relevant Background

In 1984, Congress enacted the Sentencing Reform Act, which in substantial part remains the sentencing regime that exists today. *See* Pub. L. No. 98–473, §§211-212, 98 Stat 1837 (1984), *codified at* 18 U.S.C. § 3551 *et seq.*; *see Mistretta v. United States*, 488 U.S. 361, 365-66 (1989) (noting that the Sentencing Reform Act of 1984 wrought "sweeping changes" to federal criminal sentencing). That legislation falls in Chapter 227 of Title 18, which covers "Sentences." Chapter 227, in turn, consists of subchapter A ("General Provisions"), subchapter B ("Probation"), subchapter C ("Fines"), and subchapter D ("Imprisonment). Two provisions—one from subchapter A and one from subchapter B—are relevant to the question of whether a sentencing court may impose a term of continuous incarceration that exceeds two weeks[6] followed by a term of probation, such as the sentence requested by the United States here.

---

[6] A period of incarceration that does not exceed two weeks followed by a term of probation is also permissible under 18 U.S.C. § 3653(b)(10). *See* Part V(b) *infra*.

First, in subchapter A, 18 U.S.C. § 3551 sets out "[a]uthorized sentences." Section 3551(a) makes clear that a "defendant who has been found guilty of" any federal offense "shall be sentenced in accordance with the provisions of" Chapter 227 "[e]xcept as otherwise specifically provided." 18 U.S.C. § 3551(a). Section 3551(b) provides that a federal defendant shall be sentenced to "(1) a term of probation as authorized by subchapter B; (2) a fine as authorized by subchapter C; or (3) a term of imprisonment as authorized by subchapter D." 18 U.S.C. § 3551(b).[7] As a general matter, therefore, "a judge must sentence a federal offender to either a fine, a term of probation, or a term of imprisonment." *United States v. Kopp*, 922 F.3d 337, 340 (7th Cir. 2019).

Second, 18 U.S.C. § 3561, the first provision in subchapter B, addresses a "[s]entence of probation." As initially enacted, Section 3561 provided that a federal defendant may be sentenced to a term of probation "unless . . . (1) the offense is a Class A or Class B felony and the defendant is an individual; (2) the offense is an offense for which probation has been expressly precluded; or (3) the defendant is sentenced at the same time to a term of imprisonment for the same or a different offense." Pub. L. No. 98-473, at § 212; *see United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992) (noting that the Sentencing Reform Act did not permit "a period of 'straight' imprisonment . . . at the same time as a sentence of probation").

Congress, however, subsequently amended Section 3561(a)(3). In 1991, Congress considered adding the following sentence to the end of Section 3561(a)(3): "However, this paragraph does not preclude the imposition of a sentence to a term of probation for a petty offense if the defendant has been sentenced to a term of imprisonment at the same time for

---

[7] Section 3551(b) further provides that a sentencing judge may impose a fine "in addition to any other sentence." 18 U.S.C. § 3551(b).

another such offense." H.R. Rep. 102-405, at 167 (1991). Instead, three years later Congress

revised Section 3561(a)(3) by appending the phrase "that is not a petty offense" to the end of the

then-existing language. *See* H.R. Rep. No. 103-711, at 887 (1994) (Conference Report). In its

current form, therefore, Section 3561(a)(3) provides that a defendant "may be sentenced to a

term of probation unless . . . the defendant is sentenced at the same time to a term of

imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. §

3561(a)(3).

       ii.  <u>Analysis</u>

     Before Congress passed the Sentencing Reform Act of 1984, sentencing courts could

impose a split sentence on a federal defendant in certain cases. *See United States v. Cohen*, 617

F.2d 56, 59 (4th Cir. 1980) (noting that a sentencing statute enacted in 1958 had as its "primary

purpose . . . to enable a judge to impose a short sentence, not exceeding sixth months, followed

by probation on a one count indictment"); *see also United States v. Entrekin*, 675 F.2d 759, 760-

61 (5th Cir. 1982) (affirming a split sentence of six months' incarceration followed by three

years of probation). In passing the Sentencing Reform Act, Congress sought generally to abolish

the practice of splitting a sentence between imprisonment and probation because "the same

result" could be accomplished through a "more direct and logically consistent route," namely

the use of supervised release as set out in 18 U.S.C. §§ 3581 and 3583. S. Rep. No. 225, 1983

WL 25404, at *89; *accord* United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") §

5B1.1, Background. But Congress's 1994 amendment to Section 3561(a)(3) reinstated a

sentencing court's authority to impose a split sentence for a petty offense.

     Under 18 U.S.C. § 3561, a defendant "may be sentenced to a term of probation unless . . .

the defendant is sentenced at the same time to a term of imprisonment for the same or a different

offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). Thus, for any federal offense *other than* a petty offense, Section 3561(a)(3) prohibits "imposition of both probation and straight imprisonment," consistent with the general rule in Section 3551(b). *United States v. Forbes*, 172 F.3d 675, 676 (9th Cir. 1999); *see United States v. Martin*, 363 F.3d 25, 31 (1st Cir. 2004); *United States v. Harris*, 611 F. App'x 480, 481 (9th Cir. 2015); *Anderson*, 787 F. Supp. at 539.

But the statutory text of 18 U.S.C. § 3561(a)(3) goes further by permitting a court to sentence a defendant to a term of probation "unless" that defendant "is sentenced at the same time to a term of imprisonment for the same or a different offense that is not a petty offense." 18 U.S.C. § 3561(a)(3). It follows that when a defendant *is* sentenced for a petty offense, that defendant may be sentenced to a period of continuous incarceration and a term of probation. *See United States v. Posley*, 351 F. App'x 807, 809 (4th Cir. 2009) (per curiam). In *Posley*, the defendant, convicted of a petty offense, was sentenced to two years of probation with the first six months in prison. *Id.* at 808. In affirming that sentence, the Fourth Circuit concluded that Section 3561(a)(3) "[u]nquestionably" provided statutory authority to sentence the petty-offense defendant to "a term of six months of continuous imprisonment plus probation." *Id.* at 809; *see* Cyclopedia of Federal Procedure, § 50:203, *Capacity of court to impose probationary sentence on defendant in conjunction with other sentence that imposes term of imprisonment* (3d ed. 2021) ("[W]here the defendant is being sentenced for a petty offense, a trial court may properly sentence such individual to a term of continuous imprisonment for a period of time, as well as a sentence of probation.") (citing *Posley*); *see also* Wright and Miller, *Federal Practice and Procedure*, § 547, at n.13 (4th ed. 2021) ("A defendant may be sentenced to probation unless he . . . is sentenced at the same time to imprisonment for an offense *that is not petty*.") (emphasis added).

Nor does the phrase "that is not a petty offense" in Section 3561(a)(3) modify only "different offense." Section 3561(a)(3) does not state "the same *offense* or a different offense that is not a petty offense," which would imply that the final modifier—*i.e.*, "that is not a petty offense"—applies only to "different offense." The phrase "that is not a petty offense" is a postpositive modifier best read to apply to the entire, integrated phrase "the same or a different offense." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 148 (2012). Had Congress sought to apply the phrase "not a petty offense" solely to "different offense," the "typical way in which syntax would suggest no carryover modification" would be some language that "cut[s] off the modifying phrase so its backward reach is limited." *Id.* at 148-49. And while the indefinite article "a" might play that role in other contexts (*e.g.*, "either a pastry or cake with icing" vs. "either a pastry or a cake with icing"), the indefinite article in Section 3561(a)(3) merely reflects the fact that the definite article before "same" could not naturally apply to the undefined "different offense."

Permitting a combined sentence of continuous incarceration and probation for petty offenses is sensible because sentencing courts cannot impose supervised release on petty-offense defendants. *See* 18 U.S.C. § 3583(b)(3); *United States v. Jourdain*, 26 F.3d 127, 1994 WL 209914, at *1 (8th Cir. 1994) (unpublished) (plain error to impose a term of supervised release for a petty offense). When Congress in 1994 amended the language in Section 3561(a), it again provided sentencing courts with "latitude," *see* S. Rep. 98-225, 1983 WL 25404, at *89, to ensure some degree of supervision—through probation—following incarceration.

Section 3551(b)'s general rule that a sentencing court may impose either imprisonment or probation (but not both) does not preclude a sentencing court from imposing a split sentence under Section 3561(a)(3) for a petty offense for three reasons. First, Section 3551(a) notes that

the sentencing provisions described there apply "[e]xcept as otherwise specifically provided." Section 3561(a)(3) does "provide[]" "otherwise": it recognizes a carveout for petty offenses.

Second, the more specific permission for split sentences in petty offense cases in Section 3561(a)(3) prevails over the general prohibition on split sentences in Section 3551(b). *See Morton v. Mancari*, 417 U.S. 535, 550-51 (1974) ("Where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one."). When Congress enacted the general prohibition on split sentences in Section 3551(b), it had not yet enacted the more specific carveout for split sentences in petty offense cases in Section 3561(a)(3). *See supra*, at 23 (recounting statutory history). That carveout does not "void" the general prohibition on split sentences in Section 3551(b); rather, Section 3551(b)'s general prohibition's "application to cases covered by the specific provision [in Section 3651(a)(3)] is suspended" as to petty offense cases. Scalia & Garner, *supra*, at 184. In other words, Section 3551(b)'s prohibition against split sentences "govern[s] all other cases" apart from a case involving a petty offense. *Ibid.*

Third, to the extent Section 3551(b)'s general prohibition against split sentences conflicts with Section 3561(a)(3)'s permission for split sentences in petty offense cases, the latter, later-enacted provision controls. *See Posadas v. Nat'l Bank of N.Y.*, 296 U.S. 497, 503 (1936) ("Where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one."); Scalia & Garner, *supra*, at 327-329. Where a conflict exists "between a general provision and a specific one, whichever was enacted later might be thought to prevail." *Id.* at 185. "The "specific provision"—here Section 3561(a)(3)—"does not negate the general one entirely, but only in its application to the situation that the specific provision covers." *Ibid.* Section 3551(b)'s general prohibition does not operate against the more specific, later-enacted carveout for split sentences in Section 3561(a)(3).

An interpretation of Sections 3551(b) and 3561(a) that a sentencing court "must choose between probation and imprisonment when imposing a sentence for a petty offense," *United States v. Spencer*, No. 21-cr-147-CKK, Doc. 70 at 5 (Jan. 19, 2022), fails to accord the phrase "that is not a petty offense" in Section 3561(a)(3) any meaning. When Congress in 1994 amended Section 3561(a)(3) to include that phrase, it specifically permitted a sentencing court in a petty offense case to deviate from the otherwise applicable general prohibition on combining continuous incarceration and probation in a single sentence. Ignoring that amended language would improperly fail to "give effect to every clause and word" of Section 3561(a)(3). *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 385 (2013).

Congress's unenacted language from 1991, *see supra*, at 23, does not suggest that a split sentence is available only where a defendant is sentenced at the same time for two different petty offenses or for two offenses, at least one of which is a petty offense. For one thing, the Supreme Court has regularly rejected arguments based on unenacted legislation given the difficulty of determining whether a prior bill prompted objections because it went too far or not far enough. *See Mead Corp. v. Tilley*, 490 U.S. 714, 723 (1989) ("We do not attach decisive significance to the unexplained disappearance of one word from an unenacted bill because 'mute intermediate legislative maneuvers' are not reliable indicators of congressional intent.") (citation omitted). Moreover, under that view, every offense other than a petty offense could include some period of incarceration and some period of supervision (whether that supervision is supervised release or probation). Yet so long as a defendant was convicted of two petty offenses, that defendant could be sentenced to incarceration and supervision (in the form of probation). No sensible penal policy supports that interpretation.

It follows that a sentencing court may impose a combined sentence of incarceration and probation where, as here, the defendant is convicted of a petty offense. Here, Madden pleaded guilty to one count of 40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building, which is a "petty offense" that carries a maximum penalty that does not exceed six months in prison and a $5,000 fine. *See* 18 U.S.C. § 19; *see United States v. Soderna*, 82 F.3d 1370, 1381 n.2 (7th Cir. 1996) (Kanne, J., concurring) (citations omitted) (noting that a petty offender may face a sentence of up to five years in probation).

### b. *A sentence of probation may include incarceration as a condition of probation, though logistical and practical reasons may militate against such a sentence during an ongoing pandemic.*

#### i. Relevant Background

In 18 U.S.C. § 3563, Congress set out "[c]onditions of probation." 18 U.S.C. § 3563. Among the discretionary conditions of probation a sentencing court may impose is a requirement that a defendant

> remain in the custody of the Bureau of Prisons during nights, weekends or other intervals of time, totaling no more than the lesser of one year or the term of imprisonment authorized for the offense, during the first year of the term of probation or supervised release.

18 U.S.C. § 3563(b)(10). Congress enacted this provision to give sentencing courts "flexibility" to impose incarceration as a condition of probation in one of two ways. S. Rep. No. 225, 1983 WL 25404, at *98. First, a court can direct that a defendant be confined in "split intervals" over weekends or at night. *Id.* Second, a sentencing court can impose "a brief period of confinement" such as "for a week or two." *Id.*[8]

---

[8] Section 3563(b)(10)'s legislative history notes that imprisonment as a term of probation was "not intended to carry forward the split sentence provided in Section 3561, by which the judge imposes a sentence of a few months in prison followed by probation." S. Rep. No. 225, 1983 WL 25404, at *98.

ii.  <u>Analysis</u>

A sentencing court may impose one or more intervals of imprisonment up to a year (or,
as here, up to the six-month statutory maximum) as a condition of probation, so long as the
imprisonment occurs during "nights, weekends or other intervals of time." 18 U.S.C. §
3653(b)(10). Although the statute does not define an "interval of time," limited case law suggests
that it should amount to a "brief period" of no more than a "week or two" at a time. *United States
v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section
3563(b)(10)'s legislative history described above and reversing magistrate's sentence that
included 30-day period of confinement as a condition of probation); *accord United States v.
Baca*, No. 11-1, 2011 WL 1045104, at *2 (C.D. Cal. Mar. 18, 2011) (concluding that two 45-day
periods of continuous incarceration as a condition of probation was inconsistent with Section
3563(b)(10)); *see also Anderson*, 787 F. Supp. at 538 (continuous 60-day incarceration not
appropriate as a condition of probation); *Forbes*, 172 F.3d at 676 ("[S]ix months is not the
intermittent incarceration that this statute permits."). Accordingly, a sentence of up to two
weeks' imprisonment served in one continuous term followed by a period of probation is
permissible under Section 3563(b)(10).[9]  That would be an appropriate sentence in this case.

A sentencing court may also impose "intermittent" confinement as a condition of
probation to be served in multiple intervals during a defendant's first year on probation. 18
U.S.C. § 3563(b)(10); *see Anderson*, 787 F. Supp. at 539. Notwithstanding a sentencing court's
legal authority to impose intermittent confinement in this manner, the government has refrained

---

[9] Section 3563(b)(10)'s use of the plural to refer to "nights, weekends, or intervals of time"
does not imply that a defendant must serve multiple stints in prison. Just as "words importing the
singular include and apply to several persons, parties, or things," "words importing the plural
include the singular." 1 U.S.C. § 1; *see* Scalia & Garner, *supra*, at 129-31.

from requesting such a sentence in Capitol breach cases given the potential practical and logistical concerns involved when an individual repeatedly enters and leaves a detention facility during an ongoing global pandemic. Those concerns would diminish if conditions improve or if a given facility is able to accommodate multiple entries and exits without unnecessary risk of exposure.  In this case, the government does not request that imprisonment be imposed through "intermittent" confinement as a condition of probation.

## VI.    Restitution

As noted above, the defendant agreed under the terms of the plea agreement to pay $500 in restitution. At the plea hearing, the Court asked the government to explain the restitution amount in anticipation of the defendant's sentencing.

The defendant entered a guilty plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). That offense of conviction does not trigger the Mandatory Victims Restitution Act (MVRA) because it does not fall within the "subset" of crimes covered under that statute.  *See* 18 U.S.C. § 3663A(c)(1)(A); *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).  Madden's non-Title 18 offense of conviction also does not fall within the statutes covered by the Victim and Witness Protection Act of 1982 (VWPA).  *See* 18 U.S.C. § 3663(a)(1)(A). However, the Court is authorized to impose restitution "to the extent agreed to by the parties" in the plea agreement. 18 U.S.C. § 3663(a)(3).  So restitution here properly falls within the scope of Section 3663(a)(3) because the plea agreement requires Madden to pay $500 in restitution.  *See United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008) (upholding restitution agreement under Section 3663(a)(3) where defendant was convicted under 26 U.S.C. § 7201). A defendant's agreement to

30

pay restitution under Section 3663(a)(3) is a binding promise. *United States v. Pappas*, 409 F.3d 828, 830 (7th Cir. 2005).

The VWPA also provides that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d). Because this case essentially involves the related criminal conduct of hundreds of defendants, the Court has discretion to: (1) hold the defendants jointly and severally liable for the full amount of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution imposed under § 3663, "the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other defendants responsible only for each defendant's individual contribution to the victim's total losses. 18 U.S.C. § 3664(h).

The government and Madden, pursuant to the plea agreement, have requested the Court to apportion liability for restitution for damages arising from the riot at the United States Capitol. in the amount of $500. As noted above, determining the restitution amount is an "inexact science," *James*, 564 F.3d at 1246, that must be based on a "reasonable approximation of losses supported by a sound methodology," *Gushlak*, 728 F.3d at 196.  The nearly $1.5 million figure quoted in the defendant's plea agreement represented loss estimates provided by Architect of the Capitol as of mid-May 2021. To apportion the $1.5 million figure among defendants, the government estimated that 2,000-2,500 individuals were unlawfully present in the Capitol Building, arriving at figure of approximately $700 of damage per person. The government then determined that plea agreements for individuals convicted of felonies would require them to pay more—$2,000—and defendants pleading to misdemeanors would be required to pay less—$500.

If the government had specific evidence that a defendant damaged property, stole property, or caused injury to an officer, it would require the defendant to pay restitution for that specific conduct.

This amount fairly reflects Madden's role in the offense and the damages resulting from his conduct, but also considers the various legal and factual issues associated with calculating the actual losses for property damage to the United States Capitol and incurred by law enforcement agencies, additional costs incurred for security personnel, and bodily injuries sustained by law enforcement personnel.  In consideration of these factors, the restitution amount reflected in the plea agreement fairly represents an apportionment of Madden's liability and, therefore, is proper in this case.

**VII.   Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. As explained herein, these factors support a sentence of incarceration, followed by a period of probation. Balancing these factors, the government recommends that this Court sentence Dominick Madden to 60 days of imprisonment, followed by 36 months of probation, and $500 restitution.  Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

By:    s/Amanda Jawad
Amanda Jawad
NY Bar No. 5141155
Assistant United States Attorney, Detailee
United States Attorney's Office
211 W. Fort Street
Detroit, MI 48226
(313) 226-9116
Amanda.Jawad@usdoj.gov